IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:24CR3067 |
| vs. | |
| CLEOPHUS COLLIER, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on defendant Cleophus Collier's motion to suppress (Filing No. 20), the Magistrate Judge's Findings and Recommendation (Filing No. 35) recommending that the motion be denied, and Collier's objections (Filing No. 47) to the Findings and Recommendation. The Court will overrule the objections, adopt the Findings and Recommendation, and deny the motion to suppress.

## BACKGROUND

In June 2024, a warrant was issued for Collier's arrest stemming from a "supervised release violation." (Filing No. 34 at 6). Members of the U.S. Marshals' Metro Fugitive Task Force were charged with executing the warrant. (Filing No. 34 at 5). Investigator Jason Papke, an officer of the Lincoln Police Department and then-member of that task force, was one of them.

Investigator Papke was the first officer to arrive on the scene at Collier's last-known address. (Filing No. 34 at 9). With him in his "unmarked vehicle" was another LPD officer, Officer Mika. (Filing No. 34 at 9). Collier lived in a "long, narrow triplex where [his] unit [was] the farthest from the road." (Filing No. 34 at 10). Shortly after arriving, Investigator Papke "observed a male matching [Collier's] description walk out with trash to the curb[.]" (Filing No. 34 at 10). After using binoculars and conferring with Officer Mika, Investigator Papke "made a positive

identification of" Collier. (Filing No. 34 at 10). He noted that Collier was wearing "a black sling bag" across his shoulder. (Filing No. 34 at 13).

Investigator Papke did not expect to encounter Collier so soon. The original plan was to arrest him inside his residence. (Filing No. 34 at 12). But Investigator Papke saw an "opportunity to do an open-air takedown" in the yard in front of the triplex. (Filing No. 34 at 12). He told the later-arriving officers his new plan over the radio and requested that they "move up with" Investigator Papke and Officer Mika. (Filing No. 34 at 13).

After making the call that he was "moving up for an open-air takedown," Investigator Papke "approached in [his] vehicle." (Filing No. 34 at 14). Investigator Papke "stepped out, produced a firearm," and said "Stop, Police." (Filing No. 34 at 14). At first, Collier turned around, "put his hands out to his sides in a nonthreatening manner" and began walking toward the front door of his unit. (Filing No. 34 at 15). Collier stopped walking when a Deputy U.S. Marshal "pulled up," mounted the curb, drove through the lawn to cut him off, exited his vehicle, "produced his firearm," and "g[ave] commands." (Filing No. 34 at 16).

The rest of the events were captured on Investigator Papke's body-worn camera.[1] Without being prompted to do so, Collier took the bag off and dropped it on the ground next to him. (Filing No. 30, Ex. 1 at 00:00-00:01). Collier then put his hands up, confirmed his identity, turned around, and began walking back toward the officers, allowing Investigator Papke and a Deputy U.S. Marshal to place him in handcuffs behind his back. (Filing No.30, Ex. 1 at 00:07-00:13; Filing No. 34 at 16). Collier was surrounded by three officers after being handcuffed. (Filing No.30, Ex. 1 at 00:48). Collier asked officers if he could talk to his mother—who was sitting outside in front of Collier's unit—before they took him to jail. (Filing No. 30, Ex. 1 at 00:23); (Filing No. 34 at 18-19). The officers agreed to let him do so. (Filing No. 30, Ex. 1 at 01:13). They began to walk Collier toward his mother, back across the yard.

---

[1] The preceding events were *not* captured by Investigator Papke's body-worn camera because he "felt that accessing my firearm and placing Mr. Collier at gunpoint immediately was more important than activating a body camera." (Filing No. 34 at 25). When Collier "began to walk away" from the officers, Investigator Papke activated his body-worn camera. (Filing No. 34 at 25). Investigator Papke did not recall if footage of Officer Mika's body-worn camera exists. (Filing No. 34 at 25).

As they did so, the officers approached the bag Collier dropped. One of the officers asked Collier "is this your bag right here?" to which Collier responded "yeah." (Filing No. 30, Ex. 1 at 01:16-01:17). The officer asked if Collier "want[ed] it to go with" him to jail. (Filing No. 30, Ex. 1 at 01:17). This time, Collier said "no, that's hers, it's hers, it's all her . . . her medical . . . her medicine . . ." (Filing No. 30, Ex. 1 at 01:18-01:22). Investigator Papke was not sure if Collier was referring to the bag or its contents. (Filing No. 34 at 20-21).

Investigator Papke responded that the officers would "verify" that the bag belonged to Collier's mother. (Filing No. 30, Ex. 1 at 01:23). As the other two officers continued to walk Collier toward his mother, Officer Mika picked up the bag and looked inside. (Filing No. 34 at 22-23). He showed Investigator Papke "the butt or pistol grip of a handgun." (Filing No. 34 at 22); (Filing No. 30, Ex. 1 at 01:46). In Investigator Papke's view, Officer Mika looked in the bag "[a]s part of the search incident to arrest." (Filing No. 34 at 23). The officers later took Collier to the Lancaster County Jail. (Filing No. 34 at 26). After being advised of and waiving his *Miranda* rights, Collier admitted to owning the gun. (Filing No. 34 at 28); (Filing No. 30, Ex. 2 at 01:44).

Collier was later charged with violating 18 U.S.C. §§ 922(g)(1) and 924(a)(8)—being a felon in possession of a firearm. (Filing No. 1). He moved to suppress evidence of the firearm and his incriminating statements at the jail, arguing that the warrantless search of the bag was unreasonable and any statements he made are inadmissible as "fruit" of the unlawful search. (Filing No. 20); (Filing No. 21). Following an evidentiary hearing, the Magistrate Judge recommended that the motion be denied. (Filing No. 35).

**STANDARD OF REVIEW**

Under 28 U.S.C. § 636(b)(1), when a party objects to a proposed findings of fact and recommendation by a magistrate judge, the Court must "make a de novo determination of those portions . . . to which objection is made." *Id. See also Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) ("When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); see Fed. R. Crim. P. 59(b)(3). If desired, a reviewing district court judge may also "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

3

When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the hearing, reviewed the exhibits, and read all briefing submitted by the parties. Having done so, the Court finds Collier's objections should be overruled.

## DISCUSSION

The Court agrees with the Magistrate Judge's conclusion that Collier's motion to suppress should be denied under the search incident to arrest exception to the warrant requirement.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant,* 556 U.S. 332, 338 (2009). The Magistrate Judge found that one applied here. She reasoned that the Officer Mika's search of the bag was justified as a search incident to arrest, one of "the exceptions to the warrant requirement[.]" *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010) (citation omitted). "A search incident to arrest may lawfully extend to the arrestee's person and the area within his immediate control, that is, the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Id.* (citation modified). "This exception 'derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.'" *Id.* (quoting *Arizona v. Gant*, 556 U.S. 332, 337 (2009)).

The Magistrate Judge found that Collier "was not under complete control when he was handcuffed with three officers standing behind him." (Filing No. 35 at 7). Officer Papke testified that arrestees can "slip their handcuffs" and may need "two or more officers on each arm to prevent" them from lunging toward items. (Filing No. 35 at 7). Those factors, coupled with "the circumstances surrounding Defendant's arrest" like the open-air takedown and Collier's initial failure to stop walking when the officers approached him, persuaded the Magistrate Judge that "the bag was in Defendant's immediate control and officers were justified in searching the bag incident to Defendant's arrest." (Filing No. 35 at 7).

4

The Court agrees. That conclusion is dictated by *Perdoma*, where the Eighth Circuit found that the warrantless search of a bag was justified even though the defendant was "restrained and a police officer had taken control of the bag." 621 F.3d at 750. The court rejected the defendant's argument that "during the search, the bag was 'beyond his reach' because he was restrained and a police officer had taken control of the bag." *Id.* "Whether an officer has exclusive control of a seized item does not," the Eighth Circuit held, "necessarily determine whether the item remains in 'the area from within which [the arrestee] might gain possession of a weapon or destructible evidence.'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). The Eighth Circuit has repeatedly "rejected the notion that an officer's exclusive control of an item necessarily removes the item from the arrestee's area of immediate control." *Id.; see, e.g., United States v. Morales*, 923 F.2d 621, 626–27 (8th Cir. 1991); *United States v. Mefford*, 658 F.2d 588, 591–93 (8th Cir. 1981); *United States v. Horne*, 4 F.3d 579, 586–87 (8th Cir. 1993).

Here, as in *Perdoma,* "the search of the bag occurred in close proximity to where [Collier] was restrained[.]" 621 F.3d at 750. As the Magistrate Judge found, "at the time [he] was handcuffed," the bag lay on the ground around "ten feet" away. (Filing No. 35 at 5). Investigator Papke testified that the bag was within Collier's lunging range. (Filing No. 34 at 38, 40). The same is true at the time the bag was searched. Footage from Investigator Papke's body-worn camera shows Officer Mika was close behind Collier when he looked inside the bag. (Filing No. 30, Ex. 1 at 01:45). And while it is true that Collier was handcuffed, "handcuffs are not fail-safe[.]" *United States v. Shakir*, 616 F.3d 315, 320 (3d Cir. 2010). Investigator Papke confirmed as much through personal experience. (Filing No. 34 at 39).

Other factors provide further justification for the search. For one, Collier did not immediately comply with Investigator Papke's commands. When the officers arrived, Collier ignored Investigator Papke's direction to "[s]top" and walked "twenty-five to thirty feet away[.]" He stopped walking only when another officer "mounted the curb, drove through the lawn, produced his firearm," and shouted commands at Collier. (Filing No. 35 at 2-3); *cf. Perdoma,* 621 F.3d at 751 (holding the search justified as a search incident to arrest, in part, because the defendant "had already run from the officers once"). For another, the officers "did not know how strong [Collier] was." *Id.* As the Magistrate Judge noted, Collier "is a relatively fit man of a similar height, age, and build to the arresting officers." (Filing No. 35 at 7). Under these circumstances, the bag

5

was within "the area into which [the] arrestee might reach in order to grab a weapon or evidentiary items." *Id.* (citation omitted).

Nothing in Collier's statement of objections persuades the Court otherwise. His brief does not cite *Perdoma,* much less make any attempt to explain why its holding should not apply here. Instead, he challenges Investigator Papke's credibility. (Filing No. 48 at 2-3). But the Court is mindful that the Magistrate Judge had the "comparative advantage at evaluating [Investigator Papke's] credibility" at the hearing. *Burnett v. United States*, 125 F.4th 912, 915 (8th Cir. 2025). And nothing in his testimony comes close to being "internally inconsistent or based on testimony that is incoherent, implausible, or contradicted by objective evidence in the case." *Id.* Collier argues that Investigator Papke "made incorrect assumptions about" him based on his criminal history. (Filing No. 55 at 1). But that is a red herring. Investigator Papke's understanding of Collier's criminal history has no bearing on any of the operative facts outlined above—all facts that support the Magistrate Judge's conclusion that Collier *could* have lunged for the gun inside the bag. *See Perdoma,* 621 F.3d at 751. That is why the search falls within the search incident to arrest exception.

The Court will therefore adopt the Magistrate Judge's Findings and Recommendation. Additionally, even if the search here was not justified under the search incident to arrest exception, the search appears to be valid because Collier lacked "a reasonable expectation of privacy" in the bag after abandoning it.[2] *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016)

"The Fourth Amendment is not implicated by a search of property that has been abandoned because a defendant who has abandoned his property has relinquished his reasonable expectation of privacy." *Id.* (citation modified); *see United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018) ("It is well-established that a defendant does not have a reasonable expectation of privacy in abandoned property."). If Collier abandoned the bag, "he forfeited his expectation of privacy and cannot raise a Fourth Amendment challenge to the subsequent search." *Id.* A finding of abandonment depends on the totality of the circumstances, with "two important factors [being] denial of ownership and physical relinquishment of the property." *Crumble,* 878 F.3d at 659

---

[2] For her part, the Magistrate Judge assumed, without deciding, that Collier did not abandon the bag because she found the search incident to arrest exception to be determinative. (Filing No. 35 at 5 n.2). The Findings and Recommendation therefore does not discuss the abandonment issue.

6

(citation omitted). Whether property has been abandoned "is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Nowak,* 825 F.3d at 948. "It does not matter whether the defendant harbors a desire to later reclaim an item." *Id.* (citation modified) (quoting *United States v. Basinski*, 226 F.3d 829, 836–37 (7th Cir. 2000)).

      Here, both "important factors" seem to be present. *First*, Collier "physical[ly] relinquished" the bag by taking it off and dropping it. (Filing No. 30, Ex. 1 at 00:00-00:01).[3] As Investigator Papke testified, nobody asked Collier to do that. (Filing No. 34 at 16). And in doing so, Collier "gave all the standard indications of somebody trying to separate himself from something he didn't want to be caught with that was on his person." (Filing No. 34 at 49-50). *Second*, Collier "den[ied] . . . ownership" of the bag. Initially, Collier said the bag was his but changed course when one of the officers asked if Collier wanted the bag to come to jail with him. Collier said "no, that's hers, it's hers, it's all her . . . her medical . . . her medicine . . ." (Filing No. 30, Ex. 1 at 01:18-01:22). Generally, "statements to the officers that [the defendant] did not own the bag [a]re sufficient to constitute abandonment." *United States v. Sanders*, 130 F.3d 1316, 1317 (8th Cir. 1997); *see also, e.g., United States v. Porter*, 107 F.3d 582, 583–84 (8th Cir. 1997) (finding abandonment where defendant told officer to "go ahead and search the bag" because "it was not his and he had never seen it before").

      In the Court's view, then, it appears Collier also abandoned the bag prior to the search and "surrendered any legitimate expectation of privacy he had in" it. *Sanders,* 130 F.3d at 1318. So, Collier's motion could be denied on those grounds even if the search were not justified as a search incident to his arrest. Accordingly,

---

      [3] The Court notes that there could be a number of reasons for dropping the bag. For example, Collier stated in his brief that he did so because he saw that law enforcement had guns drawn, were ordering him to stop, and it was clear that he was being detained or arrested. (Filing No. 21 at 9). But as the Eighth Circuit has made clear, *Collier's* thoughts are not relevant to the Court's inquiry. *See, e.g., United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997) ("Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent."). Here, the officers thought Collier was trying to distance himself from the bag. (Filing No. 34 at 49-50). That belief was objectively reasonable based on the totality of the circumstances in this case.

**IT IS ORDERED:**

1. Collier's objections (Filing No. 47) to the Findings and Recommendation are overruled.
2. The Magistrate Judge's Findings and Recommendation (Filing No. 35) is adopted.
3. Collier's motion to suppress (Filing No. 20) is denied.
4. This case will be set for trial by separate order.

Dated this 22nd day of August, 2025.

BY THE COURT:

Susan M. Bazis
United States District Judge